199 F.3d 477 (D.C. Cir. 1999)
 Air Line Pilots Association, International, Appellee/Cross-Appellant
v.
Northwest Airlines, Inc.,Appellant/Cross-Appellee
 No. 98-7196 Consolidated with 98-7202
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued September 9, 1999
Decided December 28, 1999
Order Granted Rehearing En Banc March 9, 2000
 
 Appeals from the United States District Court for the District of Columbia(No. 97cv01917)
 John J. Gallagher argued the cause for appellant/cross appellee. With him on the briefs were Cathy Wassberg, Neal D. Mollen, and Intra L. Germanis.
 Jerry Anker argued the cause for appellee/cross-appellant. With him on the briefs were Elizabeth Ginsburg and James K. Lobsenz.
 Before: Ginsburg, Sentelle, and Garland, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Ginsburg.
 Ginsburg, Circuit Judge:
 
 
 1
 For more than 30 years Northwest Airlines has required newly hired pilot trainees to sign individual employment contracts called "Conditions of Employment." In 1995 Northwest added several new provisions to the Conditions, including a clause under which each trainee agreed to binding arbitration of any claim he might have against Northwest for discrimination in employment.
 
 
 2
 The Air Line Pilots Association (ALPA), which is the union that represents Northwest pilots once they have completed their training, filed suit claiming that the carrier violated the Railway Labor Act, 45 U.S.C. 151 et seq., by requiring individual trainees to agree to the Conditions without first having bargained with ALPA over them. The district court granted partial summary judgment for each party; the court enjoined Northwest, pending completion of the bargaining and mediation process, from applying the Arbitration Clause to pilots who have completed their training and are represented by ALPA, but refused to enjoin the use of any other of the Conditions.
 
 
 3
 Northwest appeals, claiming that under Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974), the arbitration of individual statutory claims is not a mandatory subject of collective bargaining and that Northwest is therefore free to bargain individually with its employees over the Arbitration Clause. We agree and accordingly reverse the judgment of the district court on this issue.
 
 
 4
 ALPA cross-appeals, claiming the district court should have enjoined the use of other provisions that Northwest added to the Conditions in 1995. Because, in light of subsequent events, the cross-appeal does not present a live controversy, we dismiss ALPA's claim without prejudice to its raising the same claim in the future.
 
 I. Background
 
 5
 The relationship between Northwest and ALPA is governed by the Railway Labor Act (RLA), 45 U.S.C. 151 et seq. Under RLA 2 First, 45 U.S.C. 152 First, the carrier is required to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions." This statutory obligation to bargain with the union in good faith is backed up by RLA 2 Seventh, 45 U.S.C. 152 Seventh, which provides that "[n]o carrier ... shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in [ 6 of the RLA]." In other words, if the carrier is unable to reach agreement with the union on changing a rate of pay, rule, or working condition, then it must maintain the status quo until it has satisfied the multi-step process of negotiation, mediation, arbitration, and cooling-off required under RLA 6, 45 U.S.C. 156. See Detroit & Toledo Shore Line R.R. Co. v. United Transportation Union, 396 U.S. 142, 149 (1969) (describing negotiation process under 6 as "almost interminable"). If at the end of that process the parties have not reached an agreement, then the employer may unilaterally implement its proposal and the union may resort to economic self-help to resist the change.
 
 
 6
 Matters that are "directly related to 'rates of pay, rules, and working conditions'," and may therefore trigger the obligations of RLA 2 First and Seventh, are denominated "mandatory subject[s] of collective bargaining," a phrase courts have borrowed from case law arising under the National Labor Relations Act. Japan Air Lines Co. v. International Ass'n of Machinists, 538 F.2d 46, 52 (2d Cir. 1976). If a carrier and a union have a dispute over a proposed change to a mandatory subject of bargaining, then the union can get an injunction prohibiting the carrier from unilaterally implementing the change before completing the lengthy negotiation process set out in6. On the other hand, if the dispute is over a non-mandatory subject, then the carrier may unilaterally implement the change unless limited by an existing collective bargaining agreement (CBA).
 
 A. Northwest's Practice, 1966-97
 
 7
 ALPA has represented the pilots of Northwest Airlines in collective bargaining for nearly 60 years. When a pilot first begins his training with Northwest, he is not represented by ALPA or by any other union. When the pilot completes his training and enters into "revenue service" as a probationary employee, however, he immediately becomes a member of the bargaining unit represented by ALPA.
 
 
 8
 As early as 1966 Northwest unilaterally began to require that each trainee pilot agree to the Conditions as part of his contract of employment. The earliest known Conditions included provisions covering such matters as the trainee's pay, permission to use his likeness in promotions, and the assignment of rights to anything he might invent. Although trainees are not represented by ALPA when they agree to the Conditions, some of the Conditions either expressly or implicitly continue to apply for as long as the signatory remains employed as a pilot with Northwest, that is, even after the pilot becomes a member of the bargaining unit represented by ALPA.
 
 
 9
 Over the course of three decades Northwest made numerous changes to the Conditions without consulting ALPA. In 1995 the airline added an Arbitration Clause requiring employees to submit to binding arbitration all claims against it arising from the employment relationship. Of particular relevance to this appeal, the Arbitration Clause specifically requires binding arbitration of statutory employment discrimination claims brought under "the Minnesota Human Rights Acts, Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, or any other state or federal law prohibiting employment discrimination" (citations omitted). Also in 1995, Northwest unilaterally introduced other new Conditions: (1) setting the pilot's monthly salary during the probationary period, when he has completed his training and is represented by ALPA;(2) requiring the pilot to submit to a medical examination if Northwest has reason to believe he is no longer able to perform his essential job functions; (3) acknowledging that
 
 
 10
 Northwest may change various working conditions at its option; and (4) acknowledging that failure to comply with company rules is a ground for termination.
 
 B.ALPA's Objection, 1997-Present
 
 11
 In 1997 Northwest notified ALPA that it was terminating a probationary pilot and attached to the notice a copy of the Conditions he had signed. ALPA, which claims that this was the first it had learned of the Conditions, demanded that Northwest cease requiring trainee pilots to agree to them and that it inform each pilot who had signed Conditions that they were null and void. When Northwest refused to do so, ALPA filed suit in district court seeking injunctive and declaratory relief on the ground that Northwest had violated the RLA by unilaterally implementing the Conditions, which ALPA alleged are individual contracts concerning mandatory subjects of bargaining, without first negotiating with the Union as required by the RLA.
 
 
 12
 While the suit was pending before the district court, Northwest, in an attempt to respond to some of ALPA's concerns regarding the 1995 Conditions, deleted three and revised one of the provisions to which the Union objected. In presenting the new version (the 1997 Conditions) to ALPA, Robert Brodin, Northwest's vice president for labor relations, wrote:Northwest has never interpreted or applied the Conditions of Employment to operate in derogation of thecollective bargaining agreement between Northwest and ALPA. Northwest and ALPA both agree that in theevent of overlap or inconsistency, the collective bargain-ing agreement controls.
 
 
 13
 As to the Arbitration Clause in particular, however, Brodin wrote that "Northwest continues to believe that it has the right to insist on arbitration of non-contract claims as a condition of employment for new hires." The only significant change Northwest made to the Arbitration Clause was to clarify that it does not apply to claims arising out of the CBA between Northwest and ALPA.
 
 
 14
 Both ALPA and Northwest moved for summary judgment on the validity of the Conditions. The district court first considered whether Northwest's use of Conditions originating before 1995 violated the RLA. The court held that ALPA, by its failure to object to the Conditions for some 30 years, had arguably consented to them, which if true would make use of the Conditions an implied term of the CBA between Northwest and ALPA. Because that dispute related solely to the meaning of the CBA, the court held it could be resolved only by binding arbitration pursuant to RLA 2 Sixth and 3 First, 45 U.S.C. 152 Sixth and 153 First.
 
 
 15
 The court concluded that ALPA had objected in a timely fashion, however, to the Arbitration Clause introduced in 1995, and therefore had not acquiesced in Northwest's use of that term. The district court then held that the Arbitration Clause deals with a mandatory subject of bargaining. Because the Arbitration Clause would have worked a change with respect to a mandatory subject and ALPA had neither agreed to nor acquiesced in that change, the court enjoined Northwest from applying the Arbitration Clause to any pilot represented by ALPA.
 
 
 16
 The district court did not address the question whether other clauses ALPA claimed were newly included in the 1995 Conditions also violated the RLA. ALPA therefore moved to amend the court's order so as to enjoin Northwest from implementing those clauses but the district court denied the motion because of ALPA's failure to comply with local court rules.
 
 II. Analysis
 
 17
 ALPA does not challenge the district court's determination that Northwest's use of Conditions originating before 1995 must be resolved through binding arbitration. Therefore, both Northwest's appeal and ALPA's cross-appeal concern only the Union's request for an injunction against Northwest's use of particular provisions that ALPA maintains first appeared in the 1995 Conditions.
 
 
 18
 A. Northwest's Appeal: The Arbitration Clause
 
 
 19
 Is the arbitration of statutory discrimination claims a mandatory subject of bargaining? Northwest says not and claims the district court erred in enjoining its use of the Arbitration Clause, reasoning as follows. Under Alexander v. Gardner Denver Co., 415 U.S. 36 (1974), a union cannot waive the right of the employees it represents to bring a statutory discrimination claim in a judicial forum. Because ALPA cannot agree to such a provision, it cannot be a mandatory subject of bargaining. Therefore, Northwest is free to deal directly with its employees over the arbitration of such claims.
 
 
 20
 For its part, ALPA urges that the arbitration of statutory claims is a mandatory subject, and that we should therefore affirm the district court's judgment, for three independent but related reasons. First, Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991) "effectively supersedes" Gardner-Denver. If, as ALPA reads Gilmer, a union may in collectivebargaining waive the employees' right to a judicial forum for a statutory discrimination claim, then there is no reason to doubt that the arbitration of statutory claims is a mandatory subject of bargaining. Second, even if GardnerDenver is still good law, it has no effect upon whether arbitration of statutory claims is a mandatory subject of bargaining. In other words, as the district court held, Northwest must bargain with ALPA over the Arbitration Clause regardless whether ALPA could lawfully agree to it because it is directly related to "rates of pay, rules, or working conditions." Third, even if waiver of the right to a judicial forum is not a mandatory subject of bargaining because ALPA cannot agree to such a waiver under Gardner-Denver, the procedural rules for arbitration, as specified in the Arbitration Clause, are mandatory subjects of bargaining.
 
 
 21
 In Gardner-Denver, the Supreme Court considered whether an employee who had pursued arbitration of a racial discrimination claim under a CBA was thereby precluded from later asserting a Title VII claim based upon the same facts. 415 U.S. at 46-55. The Supreme Court held that "there can be no prospective waiver of an employee's rights under Title VII." Id. at 51. Because Title VII provides each individual with the right to be free of invidious discrimination, "the rights conferred can form no part of the collective bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII." Id. Therefore, although the union could and did prospectively waive the employee's right to sue upon (rather than arbitrate) his claim of discrimination in violation of the CBA, the employee's resort to arbitration of this claim did not preclude him from suing upon his statutory claim of discrimination. See id. at 51-52.
 
 
 22
 The Supreme Court also rejected the suggestion that a court should dismiss a Title VII claim if the facts underlying it had already been the subject of arbitration under a CBA that prohibited, and provided a remedy for, the discrimination. According to the Court, arbitral processes were inferior to judicial processes for protecting statutory rights, and the Congress intended the federal courts to exercise final responsibility over Title VII claims. See id. at 56-59. The Court was particularly concerned that a union, which ordinarily controls the arbitration of an employee's claim, might, if allowed, compromise the would-be Title VII plaintiff's statutory rights: "In arbitration, as in the collective-bargaining process, the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit." Id. at 58 n.19.
 
 
 23
 In the early 1980s the Supreme Court twice applied the reasoning of Gardner-Denver beyond the context of Title VII. In Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728 (1981), employees had filed suit under the Fair Labor Standards Act after having lost in arbitration on a contractual claim arising from the same facts. The employer argued that the employees' union had waived their right to bring the FLSA claim in court, noting that the CBA required employees to arbitrate "any controversy" and that the employees had in fact pursued this matter to arbitration. Id. at 736. The Court rejected this argument:
 
 
 24
 [T]he FLSA rights petitioners seek to assert in this action are independent of the collective bargaining pro-cess. They devolve on petitioners as individual workers, not as members of a collective organization. They are not waivable. Because Congress intended to give individual employees the right to bring their minimum-wage claims under the FLSA in court, and because these congressionally granted FLSA rights are best protected in a judicial rather than in an arbitral forum, we hold that petitioners' claim is not barred by the prior submission of their grievances to the contractual dispute-resolution procedures.
 
 
 25
 Id. at 745. In McDonald v. City of West Branch, 466 U.S. 284 (1984), the Supreme Court rejected the employer's argument that an employee's 1983 claim should be dismissed because he had already pursued to arbitration under the CBA a claim based upon the same facts. The Court premised its holding upon two factors: the inadequacy of arbitration for the enforcement of individual statutory rights, and the intention of the Congress that1983 be judicially enforced. See id. at 289-90.
 
 
 26
 In light of the Court's broad pronouncement in GardnerDenver that "there can be no prospective waiver of an employee's rights under Title VII," and the application of this principle to other federal statutes in Barrentine and McDonald, many courts concluded that the reasoning of Gardner-Denver applied to still other federal employment statutes, see Brisentine v. Stone & Webster Engineering Corp., 117 F.3d 519, 526 (11th Cir. 1997) (Americans with Disabilities Act); Cooper v. Asplundh Tree Expert Co., 836 F.2d 1544, 1553 (10th Cir. 1988) (Age Discrimination in Employment Act (ADEA)), and held that Gardner-Denver precluded prospective waiver of the right to sue even by the individual employee, see Alford v. Dean Witter Reynolds, Inc., 905 F.2d 104, 107 (5th Cir. 1990) (Title VII), vacated for reconsideration, 500 U.S. 930 (1991), in light of Gilmer;Utley v. Goldman Sachs & Co., 883 F.2d 184, 187 (1st Cir. 1989) (Title VII); Nicholson v. CPC Int'l Inc., 877 F.2d 221, 229 (3d Cir. 1989) (ADEA), disapproved in Gilmer, 500 U.S. 20, 24 n.1 (1991); Swenson v. Management Recruiters Int'l, Inc., 858 F.2d 1304, 1306 (8th Cir. 1988) (Title VII).
 
 
 27
 In 1991, however, the Court staked out a limit to the principle announced in Gardner-Denver. In Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991), the Court held that a claim arising under the ADEA was validly made subject to binding arbitration by an agreement between the employer and the individual (non-union) employee--a result in some tension with the broad pronouncement in GardnerDenver that "there can be no prospective waiver of an employee's rights under Title VII." 415 U.S. at 51. The Court began by noting that under the Federal Arbitration Act (FAA) an agreement to arbitrate individual statutory rights is enforceable unless the Congress intended to preclude waiver of access to a judicial forum for vindication of that right. See id. at 26. The text and legislative history of the ADEA reflect no such intent, and the Court rejected the argument that waiver should be precluded because arbitration is an inferior mechanism for resolving individual statutory claims--an argument to which the Court had given some weight in Gardner-Denver, Barrentine, and McDonald, see id. at 34 n.5. The Court expressly distinguished those cases as follows:
 
 
 28
 First, [they] did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized tore solve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case. Finally, those cases were not decided under the FAA.... Therefore, those cases provide no basis for refusing to enforce Gilmer's agreement to arbitrate his ADEA claim.
 
 
 29
 Id. at 35.
 
 
 30
 Thus, Gilmer establishes that an individual employee may himself validly agree in advance to binding arbitration of a statutory claim he may later have against his employer. See Cole v. Burns Int'l Security Servs., 105 F.3d 1465, 1478 (D.C. Cir. 1997) (citing Gilmer for the "general rule [that] statutory claims are fully subject to binding arbitration, at least outside of the context of collective bargaining"). The Court in Gilmer did not, however, address the continuing vitality of the statement in Gardner-Denver that "the rights conferred [by Title VII] can form no part of the collective bargaining process." 415 U.S. at 51; see also Wright v. Universal Maritime Serv. Corp., 525 U.S. 70, 119 S. Ct. 391, 396 (1998) (raising but not resolving the question "whether or not Gardner-Denver's seemingly absolute prohibition of union waiver of employees' federal forum rights survives Gilmer").
 
 
 31
 ALPA suggests that Gilmer "effectively supersedes" Gardner-Denver and permits a union to waive the employees' right to a judicial forum for statutory claims. The Fourth Circuit and some district courts agree, see Austin v. OwensBrockway Glass Container, Inc., 78 F.3d 875, 885 (4th Cir. 1996); see, e.g., Almonte v. Coca-Cola Bottling Co., 959 F. Supp. 569, 573-74 (D. Conn. 1997), prematurely we think.
 
 
 32
 Whatever the Supreme Court said--or, more precisely, refrained from saying--in Wright, we do not understand the Court in Gilmer to have overruled Gardner-Denver. Rather, the Court expressly distinguished that case, which strongly implies that it remains the law within its field of application.We therefore leave to the Court itself the prerogative of overruling its own precedent (if it will); we apply the law as it stands. See Rodriguez de Quijas v. Shearson/American Express Inc., 490 U.S. 477, 484 (1989).
 
 
 33
 We see a clear rule of law emerging from Gardner-Denver and Gilmer: Unless the Congress has precluded his doing so, an individual may prospectively waive his own statutory right to a judicial forum, but his union may not prospectively waive that right for him. All of the circuits to have considered the meaning of Gardner-Denver after Gilmer, other than the Fourth, are in accord with this view. See Albertson's, Inc. v. United Food & Com. Workers Union, 157 F.3d 758, 761-62 (9th Cir. 1998); Penny v. United Parcel Service, 128 F.3d 408, 413-14 (6th Cir. 1997); Brisentine v. Stone & Webster Engineering Corp., 117 F.3d 519, 526 (11th Cir. 1997); Pryner v. Tractor Supply Co., 109 F.3d 354, 365 (7th Cir. 1997); cf. Harrison v. Eddy Potash, Inc., 112 F.3d 1437, 1453 (10th Cir. 1997) (individual represented by union need not exhaust remedies under CBA before filing statutory claim in court);Varner v. National Super Market, Inc., 94 F.3d 1209, 1213 (8th Cir. 1996) (same); Tran v. Tran, 54 F.3d 115, 117-18 (2d Cir. 1995) (same); see also Cole v. Burns Int'l Security Servs., 105 F.3d 1465, 1478-79 (D.C. Cir. 1997) ("It is plain that the Supreme Court saw a critical distinction in the situations raised by Gardner-Denver and Gilmer: GardnerDenver involved arbitration in the context of collective bargaining .... Gilmer, on the other hand, raised an individual employee claim outside the collective bargaining context").
 
 
 34
 Thus, even after Gilmer, Gardner-Denver stands as a firewall between individual statutory rights the Congress intended can be bargained away by the union, see, e.g., Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 706-07 & n.11 (1983) (union may waive officers' statutory right to be free of discrimination, such as enhanced discipline, based upon union activity), and those that remain exclusively within the individual's control. Absent congressional intent to the contrary, a union may not use the employees' individual statutory right to a judicial forum as a bargaining chip to be exchanged for some benefit to the group; the statutory right "can form no part of the collective bargaining process."Gardner-Denver, 415 U.S. at 51. Applying this rule to the facts of the present case, ALPA could not lawfully agree to the Arbitration Clause because it would effect a waiver of the employees' right to a judicial forum for the vindication of their statutory claims of discrimination in employment.
 
 
 35
 ALPA argues, however, that even if Gardner-Denver precludes it from waiving employees' right of access to a judicial forum for a statutory claim, the arbitration of an employment-related claim--whatever the legal basis for the claim--remains a mandatory subject of bargaining. The
 
 
 36
 district court agreed, holding that the Arbitration Clause is a mandatory subject of bargaining "regardless of whether [ALPA] can itself enter into arbitration agreements on behalf of its members" because the Clause "governs rules or conditions of the pilots' employment with Northwest." In effect, the district court held that an employer has to bargain over a proposal concerning rates of pay, rules, or working conditions that the union is not authorized to accept and the employer could not enforce.
 
 
 37
 We cannot agree. The "essence of collective bargaining is a notion of mutuality, that if a subject is brought up each side has at least the authority both to offer and to concede."Brotherhood of Railroad Trainmen v. Akron & Barberton Belt R.R. Co., 385 F.2d 581, 603 (D.C. Cir. 1967). It follows that a proposal to trade that which is not one's to give cannot be a mandatory subject of bargaining. See Brotherhood of R.R. Trainmen, 385 F.2d at 603-04 (proposal to bargain over effects of job terminations, normally a mandatory subject, held non-mandatory because union "could not bargain away any part of the rights that accrued to employees under the [arbitral] Award"); Southern Pacific Co. v. Switchmen's Union, 356 F.2d 332, 334-35 (9th Cir. 1966) (proposal to redefine certain work as within particular craft held non-mandatory because railroad could not lawfully agree to it: "These then are not such disputes as can be resolved by capitulation of the railroad and thus are not the proper subject [for bargaining under RLA] section 6"). Because Gardner-Denver precludes ALPA from agreeing to binding arbitration of individual statutory claims, we conclude that the Arbitration Clause is not a mandatory subject of bargaining.*
 
 
 38
 ALPA argues next that the district court properly enjoined Northwest's implementation of the Arbitration Clause even if the waiver of employees' right to a judicial forum for statutory claims is not a mandatory subject, because ALPA can still lawfully bargain over the procedures to be used in arbitration. The Union claims these procedures are a mandatory subject of bargaining because the remedy awarded to a successful complainant in the arbitration of a discrimination claim could affect the "rates of pay, rules, or working conditions" of all employees, for example by restructuring their seniority rights.
 
 
 39
 We fail to see how a remedy imposed by an arbitrator in a proceeding involving only the employer and an individual employee could have any adverse effect upon the working conditions of the employees in the bargaining unit. Although an arbitral award could indeed subject the employer to an obligation inconsistent with the CBA, that is not the Union's problem but the employer's: the employer simply cannot make any unilateral change respecting a mandatory subject of bargaining without first negotiating with the Union as required under the RLA, and a private arbitration between the employer and an individual employee does not alter this rule of law.
 
 
 40
 In any event, as we read Gardner-Denver and Gilmer, ALPA can have no role in negotiating obligatory procedural rules for arbitration of individual statutory claims. Read together, those cases establish that only the individual can determine in what forum he will vindicate his statutory rights, and this choice should not be burdened by the majoritarian concerns that motivate a union. If a union has a mandatory role in negotiating the terms that will apply to arbitration, then it could also contrive to discourage the exercise of the employee's right to choose a forum.
 
 
 41
 We conclude that the Arbitration Clause is not a mandatory subject of bargaining under the RLA. Therefore, Northwest is not required by RLA 2, 45 U.S.C. 152, to negotiate with ALPA over it. Instead, Northwest may, as it did, propose the Arbitration Clause directly to each individual employee.While it has long been clear that "members [of a bargaining unit] cannot bargain individually on behalf of themselves as to matters which are properly the subject of collective bargaining," Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192 (1944), it is just as well-established that an employee represented by a union may bargain directly with his employer over a non-mandatory subject of collective bargaining as long as the proposed individual contract "is not inconsistent with a collective agreement" or somehow implicated in an unfair labor practice, J.I. Case Co. v. NLRB, 321 U.S. 332, 339 (1944).
 
 
 42
 Here, the Arbitration Clause applies only to the statutory rights of individuals and is not inconsistent with the CBA; nor is Northwest using its direct dealings with the employees either to change anyone's obligations under the CBA or to avoid dealing with the union on a mandatory subject of bargaining. Under these circumstances, the RLA is no bar to Northwest's contracting individually with its employees.
 
 
 43
 B. ALPA's Cross-Appeal: Other Clauses New in 1995
 
 
 44
 ALPA claims the district court erred in failing to enjoin Northwest from unilaterally implementing provisions other than the Arbitration Clause that the carrier added to the 1995 Conditions and that concern mandatory subjects of bargaining. Northwest counters that ALPA's cross-appeal does not present a ripe controversy in light of the airline's adoption of the scaled-down 1997 Conditions and its subsequent representations concerning their application. For the reasons stated below, we agree with Northwest and dismiss ALPA's cross appeal for want of a ripe controversy.
 
 
 45
 In 1997 Northwest dropped three of the clauses in the 1995 Conditions about which ALPA now complains. ALPA asserts that its challenge to these three clauses remains ripe because "Northwest has done nothing ... to alter or revoke the 1995 [Conditions] that have been signed by 1050 Northwest pilots, and that still remain in effect." At oral argument before this court, however, Northwest deliberately and unequivocally represented that the 1997 Conditions supersede any previous Conditions, and that the three clauses deleted in 1997 will not be enforced against persons who signed the 1995 (or prior) Conditions.
 
 
 46
 Although we are aware that "voluntary cessation of allegedly illegal conduct does not ... make the case moot," a claim for injunctive relief still requires "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." United States v. W.T. Grant Co., 345 U.S. 629, 632-33 (1953); see also Community for Creative Non-Violence v. Hess, 745 F.2d 697, 700-01 (D.C. Cir. 1984). ALPA's only response to this requirement is to say that at some time in the future Northwest might not honor its representation to the court. That is insufficient to render ALPA's requests for injunctive relief ripe at this time.If in the future Northwest were to enforce one of the clauses against a signatory employee, or were to indicate its "firm intention" to do so, Andrade v. Lauer, 729 F.2d 1475, 1481 (D.C. Cir. 1984), then the Union would have a ripe claim for injunctive relief; at present, however, "the parties have no live dispute ... and whether one will arise in the future is conjectural," Anderson v. Green, 513 U.S. 557, 559 (1995).
 
 
 47
 ALPA's only other concern is with the amended version of the Rules of Conduct clause in the 1997 Conditions. ALPA objected to the Rules of Conduct clause in the 1995 Conditions because it stated that failure to comply with the company's rules and regulations "shall be grounds for [ ] termination," but termination is governed by the CBA. In 1997, therefore, Northwest amended the Rules of Conduct provision to provide that Northwest's authority to discipline an employee represented by the Union is "subject to the grievance and arbitration provisions of the applicable [CBA]."This revision, coupled with Northwest's firm representation that it will enforce the Rules of Conduct provision only to the extent allowed by the 1997 Conditions, would seem to render ALPA's claim for injunctive relief unripe.
 
 
 48
 At oral argument, however, ALPA suggested that the revised Rules of Conduct clause still presents a ripe controversy insofar as it provides that "the Company, in its sole discretion, may amend [its] rules, regulations, or policies from time to time." If Northwest ever "in its sole discretion" changed a rule, regulation, or policy concerning a mandatory subject of bargaining, then it would violate its obligation under the RLA to negotiate such changes with the Union. In response to concern over this part of the Rules of Conduct clause, Northwest represented to the court that, "as to mandatory subjects of bargaining, [Northwest] cannot and will not make unilateral changes. Because the union has a legitimate interest." By this representation Northwest acknowledges that the phrase "in its sole discretion" is implicitly qualified by the laws of the United States, just as if the Condition said "provided, however, that Northwest may not make a change concerning a mandatory subject of bargaining without first negotiating with ALPA as required by the RLA."
 
 
 49
 In light of Northwest's representation, we fail to discern any present controversy over the Rules of Conduct clause. The parties agree that the clause does not affect Northwest's obligations under the RLA to negotiate with ALPA. Northwest has not invoked the clause to make any unilateral change concerning a mandatory subject of bargaining, and it unequivocally states that it will not do so in the future. ALPA's claim reduces to the fear that sometime in the future Northwest may renege upon this representation to the court. That possibility is speculative at best, and in our view utterly implausible. But should it ever come to pass, then the doors of the courthouse will be open wide to ALPA.
 
 III. Conclusion
 
 50
 Northwest did not violate the RLA by implementing the Arbitration Clause without first negotiating with ALPA. In No. 98-7196, therefore, we vacate the injunction the district court entered against Northwest. In No. 98-7202, ALPA's cross-appeal, we do not find a ripe case or controversy at this time; accordingly, we dismiss that case without prejudice to ALPA's raising the same claim in the future.
 
 
 51
 It is so ordered.
 
 
 52
 BEFORE: Edwards, Chief Judge; Silberman, Williams, Ginsburg , Sentelle, Henderson, Randolph, Rogers, Tatel and Garland, Circuit Judges
 
 
 
 Notes:
 
 
 *
 Although Gardner-Denver suggests that the arbitration of individual statutory claims is an impermissible subject of bargaining, we need not decide today whether it is an impermissible or a permissible subject; the only issue presented is whether it is a mandatory subject. See Brotherhood of Railroad Trainmen, 385 F.2d at 604 n.52.
 
 
 ORDER
 March 9, 2000
 Per Curiam
 
 53
 Upon consideration of the petition for rehearing en banc of appellee/cross- appellant, the response thereto, and the vote by a majority of the judges of the court in regular active service in favor of the petition, it is
 
 
 54
 ORDERED that the petition be granted. These cases will be reheard by the court sitting en banc on Wednesday, May 10, 2000 at 10 A.M. The judgment filed herein on December 28, 1999 is hereby vacated. It is
 
 
 55
 FURTHER ORDERED that an order governing further proceedings shall issue separately.